MEMORANDUM OF DECISION
This memorandum of decision addresses petitions to terminate the parental rights (TPR of Michelle H. and John Doe, the biological parents of the minor child Ryan H. The Department of Children and Families (DCF) filed the TPR petition against Michelle H. on July 21, 2000, alleging the grounds of abandonment, failure to rehabilitate, acts of omission or commission,[2] and lack of an ongoing parent-child relationship. A TPR petition involving Ryan's putative father was also filed on that date, alleging the grounds of abandonment, acts of omission or commission,[3]
and lack of an ongoing parent-child relationship. Thereafter, on December 21, 2000 the court (Dewey, J.) granted the petitioner's motion to cite in John Doe as the operative respondent father, with no change in the pending TPR allegations. For the reasons stated below, the court finds all matters in favor of the petitioner, except for those allegations relating to acts of omission or commission against Michelle H. and John Doe, which the court now dismisses, based on the insufficiency of the evidence.
Trial of this highly-contested matter took place on July 30, 31 and August 1, 2001. The petitioner, Michelle H. and the child,[4] were vigorously represented by counsel throughout the proceedings, which the respondent mother attended. John Doe did not participate.
The Child Protection Session of the Superior Court, Juvenile Matters division, has jurisdiction over the pending matter. Notice has been provided in accordance with the applicable Practice Book provisions. No action is pending in any other court affecting custody of this child.
 I. FACTUAL FINDINGS
The Court has thoroughly considered the verified petitions, the TPR social study and update,[5] and the multiple other documents submitted in evidence, which included records from numerous service providers, psychological evaluations, and a criminal history. The court utilized the applicable legal standards[6] in considering this evidence and the testimony of trial witnesses, who included DCF social workers, family members, a psychologist, a substance abuse counselor, and Michelle H. Upon deliberation, the court finds that the following facts were proven by clear and convincing evidence at trial:
I. A. MICHELLE H., THE MOTHER
CT Page 14371
I. A. 1. EVENTS PRIOR TO THE NEGLECT ADJUDICATION OF JULY 15, 1999
Michelle H. was born on September 15, 1970. She completed the eleventh grade, and has held, in the past, a number of short-term jobs in the food industry and at factories. Michelle H. has been using crack cocaine since age twenty-three. At times, she has spent $100 to $200 for daily cocaine use. (Exhibits 14, 16; Testimony of Ellen C.) Michelle H. has a history of substance abuse treatment in Atlanta, at Berkshire Woods, at the Joseph Center, and two admissions for inpatient treatment at the McCall Foundation (McCalls), all followed by relapse. (Exhibits 14, 16; Testimony of Michelle H., Margaret O.)
On May 28, 1988, Michelle H. gave birth to her first child, Michael O. Her second child, Brian O., was born on March 2, 1993. In 1995, Michelle H. formally ceded her sons' guardianship to Margaret O., their paternal grandmother. Michelle H. has not since served as the primary caretaker for her two older sons. (Exhibits 1, 2; Testimony of Margaret O., Deborah D.)
DCF became involved with Michelle H. upon referral from the hospital where she gave birth to her third son, Ryan, on May 1999. Both mother and the infant tested positive for cocaine: Michelle H. admitted to cocaine use through the gestational period, including the day before Ryan's delivery. (Exhibits 3, 15; Testimony of Deborah D., Emily C.) Upon discharge from the hospital, DCF obtained custody of Ryan by executing a ninety-six hour hold. On May 21, 1999, the court (Leheney, J.) entered an Order of Temporary Custody (OTC) and issued specific steps for reunification. Among other things, the steps expressly required Michelle H. to cooperate with substance abuse treatment at the Morris Foundation; refrain from drug use; obtain suitable housing; undergo parenting and individual counseling to address the dual treatment goals of recovery from substance abuse, and to "understand and prevent negative impacts of substance abuse on well-being of children. "[7] (Exhibit 15, 20; Testimony of Emily C., Margaret C.[8])
On May 24, 1999, Michelle H. entered the Morris Foundation Women and Children's Program (MF-WAC) for residential drug treatment. MF-WAC personnel found her to be suffering from Cocaine Dependence without sustained full remission, and noted both her history of relationships with drug users or dealers and her lack of a present support system (Exhibit 14.)
After hearing on July 15, 1999, the court (Lopez, J.) found Ryan to be a neglected child, upon allegations that he was denied proper care and attention while in the respondent's care, but allowed Ryan to be returned to Michelle H. at the MF-WAC residential program, under DCF protective CT Page 14372 supervision.[9] (Exhibit 14.) The court reiterated the May 21, 1999 steps and added the obligation that Michelle H. continue inpatient treatment at MF-WAC program until discharge; follow recommendations for relapse prevention and other post-discharge treatment; and "upon discharge from Morris, a report on what recovery means to you." (Exhibit 20.)
I. A. 2. EVENTS FOLLOWING THE NEGLECT ADJUDICATION OF JULY 15, 1999
During her stay at the MF-WAC program, Michelle H. displayed a negative attitude, had difficulty controlling her anger, and was unable or unwilling to abide by reasonable program rules. On August 5, 1999, she was terminated from the MF-WAC program due to noncompliance, and contemporaneously entered into a three-month service agreement with DCF, agreeing to begin intensive outpatient drug treatment, to remain living in a stable residence, and to comply with the specific steps ordered by the court. (Exhibit 4.) From August 9 to 27, 1999, Michelle H. received intensive drug treatment at the Morris Foundation Outpatient Program. On discharge, she was referred to multi-modal therapies provided by Family Service of Greater Waterbury (FSGW), and was advised to consistently attend NA/AA meetings.
After leaving ME-OP, Michelle H. moved with Ryan into the household of Marge and Keith C. and their three children, agreeing to pay for room and board. (Testimony of Marge C.) On September 8, 1999, Michelle H. commenced outpatient substance abuse treatment at the LifeLine Program sponsored by Wheeler Clinic; there, she was diagnosed as having Cocaine Dependence, with a question of Impulsive Control Disorder. Michelle H. failed to respond to the Lifeline program's persistent efforts at tendering substance abuse treatment.[10] During this period, Michelle H. also had the opportunity for treatment by FSGW, where she was enrolled for individual counseling and treatment for her substance abuse, family violence and anger issues. (Exhibit 14.) FSGW diagnosed Michelle H. with Cocaine Dependency in remission, but recommended that she continue individual outpatient therapy at FSGW and attend AA/NA consistently. The respondent attended nine individual counseling sessions at FSGW, then discontinued contact with the agency in early November 1999. In late 1999, FSGW terminated Michelle H. for non-compliance with conditions of the program, her overt negative attitude, and anger problems. (Exhibits 10, 16.)
Despite the treatment provided by the Lifeline Program and FSGW, the existence of the specific steps and the service agreement, it became evident that Michelle H. had relapsed and recommenced using cocaine on multiple occasions during the fall of 1999.[11] On November 29, 1999, in view of Michelle H.'s non-compliance with the service agreement, DCF CT Page 14373 invoked a second ninety-six hour hold upon Ryan, and removed him from the respondent's care. (Exhibit 17; Testimony of Emily C.) Immediately thereafter, Michelle H. left the home of Marge and Keith C., and she lived for many months thereafter without a stable residence.
On December 2, 1999, the court (Lopez, J.) sustained an ex parte OTC motion concerning Ryan, and fully articulated specific steps for the respondent.[12] (Testimony of Emily C.) On December 22, 1999, with Michelle H.'s support, DCF placed Ryan with Marge and Keith C., licensed foster parents. (Testimony of Marge C., Emily C.) On February 16, 2000, after hearing, the court (Moore, J.) committed Ryan to DCF custody for a period of one year,[13] and again imposed the December 1999 specific steps.
In January 2000, complying with the specific steps, DCF had recommenced the process of obtaining Michelle H.'s placement in a long term inpatient program for mothers with children. DCF arranged for evaluations at the Morris Foundation and instructed Michelle H. how to initiate admission to the Carnes Weeks Center (Carnes Weeks) and Trinity Glen Inpatient program.[14] (Exhibit 5.) Instead of using these resources, Michelle H. continued to use drugs, failed to timely attend drug screens that were scheduled, and remained without a stable address. (Exhibit 6; Testimony of Marge C.) Some six months later, in mid-June 2000, Michelle H. entered Carnes Weeks, to prepare for long-term substance abuse treatment.
On June 7, 2000, after hearing, the court (Lopez, J.) had found that reunification efforts were no longer appropriate for Michelle H. On July 21, 2000, as noted, TPR petitions were filed against Michelle H. and an individual she put forth as being as Ryan's father.
I. A. 3. EVENTS FOLLOWING THE FILING OF THE TPR PETITION ON JULY 21, 2000
On August 2, 2000, Michelle H. commenced long-term inpatient treatment at Southeastern Council on Drug Dependence (SCADD). (Exhibit A; Testimony of Ellen C., Michelle H.) Michelle H. has remained in residence since her admission and has complied with the program, participating in parenting sessions, group meetings, and relapse prevention. Michelle H. now works as a cook for SCADD, and has been scheduled for discharge, although she has not yet obtained suitable housing. (Exhibit A; Testimony of Ellen C.)
On November 21, 2000, Michelle H. underwent a court-ordered assessment and interactional evaluation with Ryan. At that time, Julia Ramos Grenier, Ph.D., a skilled and experienced forensic psychologist, found Michelle H. to have borderline intelligence, with emotional characteristics consistent with impulsive behaviors, hostility, and CT Page 14374 misinterpretation of others' actions. (Testimony of Dr. Grenier; Exhibit 2.)
I. A. 4. MICHELLE H.'s VISITATION WITH RYAN
Since July 15, 1999, the specific steps have required Michelle H. to visit with Ryan as often as DCF permits. (Exhibit 20.) DCF offered Michelle H. weekly visitation from the time of Ryan's return to DCF custody on November 29, 1999 until March 6, 2000. (Exhibit 1.) However, during this period the respondent repeatedly missed, cancelled or appeared late for visits: she formally visited with Ryan only three times during this period. (Exhibits 1, 17.) In March 2000, Michelle H. attended a visitation session while she was under the influence of cocaine: she admitted her current abuse of illegal drugs. DCF then suspended Michelle H.'s visitation with Ryan, pending her participation in a treatment program. Michelle H. continued to see Ryan informally, on an irregular occasional basis.[15] (Exhibit 1; Testimony of Deborah D.)
Michelle H. requested resumption of scheduled visitation soon after she entered Carnes Weeks in mid-June 2000, but agreed with DCF that formal visits should remain suspended until she reached a stable status in her recovery. (Exhibits 16, 17; Testimony of Deborah D.) In September of 2000, Michelle H. agreed to participate in psychological and interactional evaluations before visitation would be resumed. (Testimony of Deborah D.) In November 2000, upon Dr. Grenier's observation that Michelle H. was making some progress in her residential substance abuse treatment program and that Ryan would not be harmed by her visits, DCF reinstated visitation. From that point until early June, 2001, the respondent's liberal supervised visitation with Ryan took place at the home of Margaret O. on weekends when Michelle H. was given passes from her inpatient substance abuse program. When the foster parents declined to continue as visitation supervisors, DCF arranged for Michelle H. and Ryan to attend bi-monthly visits at Family Services' Visitation Center. (Exhibit 1; Testimony of Debra D.)
I. B. RYAN'S PATERNITY
Michelle H. admits that she cannot identify Ryan's father. (Testimony of Michelle H.) During the neglect proceedings in 1999, she had suggested that Rodney O. was Ryan's father: however, this individual's relationship with Ryan was excluded through a July 1999 paternity test.[16] On December 12, 2000, the court ordered publication upon John Doe, as Ryan's putative father, and subsequently granted the petitioner's motion to cite him in as an alternate paternal respondent. (Dewey, J.) On January 17, 2001, the court confirmed service by publication on and entered a defaulted against John Doe for failure to appear. (Dewey, J.) CT Page 14375
I. C. RYAN, THE CHILD
Ryan, who is now two and a half years old, suffered from symptoms of cocaine withdrawal following his birth on May 1999. (Exhibit 15.) As noted above, DCF assumed Ryan's care in May 1999, but he was returned to Michelle H.'s care in mid-July 1999. In November 1999, DCF again obtained custody of Ryan: since December 1999, he has remained in foster care with Marge and Keith C.[17] (Testimony of Deborah D., Michelle C.) Ryan has developed strong bonds with his foster parents and his older foster siblings. Marge and Keith C., whom Ryan calls "mom" and "dad," would like to adopt him. (Testimony of Marge C.)
 II. ADJUDICATION
As to the adjudicatory phase of these proceedings,[18] the court has considered the evidence related to circumstances and events prior to July 21, 2000, insofar as the allegations pertaining to Michelle H's abandonment and ongoing parent-child relationship with Ryan are concerned.[19] As to the allegations of failure to achieve rehabilitation brought against her, the court has also considered the evidence and testimony related to circumstances occurring through the close of trial.[20] Insofar as John Doe is concerned, the court has considered the evidence related to events prior to the date when the TPR petition was filed against him. As is further discussed below, the court has determined that statutory grounds for termination exist as to both respondents.
II. A. LOCATION AND REUNIFICATION EFFORTS
Based on the clear and convincing evidence produced at trial, the court finds that under the circumstances presented by this case DCF made reasonable efforts[21] at location and reunification, as required by General Statutes § 17a-112(c)(1).[22]
The clear and convincing evidence reflects that DCF used consistent efforts to reunify Michelle H. and Ryan, cooperating with the respondent's placement requests, actively intervening with the Lifeline program to obtain a "second chance" for the respondent, and providing a variety other treatment options.[23] (Testimony of Emily C.) However, it is apparent that Michelle H. failed for a prolonged period to meaningfully engage herself in the rehabilitation process; failed to provide accurate phone numbers or addresses at which she could be reached by DCF; and interfered with efforts to maintain a bond with Ryan by relapsing into drug use and failing to attend regularly-offered visitation sessions. Furthermore, as noted, on June 7, 2000, the court CT Page 14376 found that further efforts at reunification were not appropriate for Michelle H. and Ryan. The court now finds, based on clear and convincing evidence and as discussed in Parts II. B. 2. and III. B., continued reunification efforts for Michelle H. would be contrary to Ryan's best interests.
John Doe, Ryan's putative father, did not make himself available for participation in any of these proceedings. He has never visited with Ryan, expressed concern or care for this child, or supported him financially or in any other way, so that extension of reasonable reunification efforts would have been "a useless and futile act." In reAntony B., 54 Conn. App. 463, 476, 735 A.2d 893 (1999). (Exhibit 1; Testimony of Emily C.) In the absence of other evidence, the court finds that John Doe is unable or unwilling to benefit from reasonable reunification efforts.
II. B. STATUTORY GROUNDS FOR TERMINATION — MICHELLE H.
II. B. 1. ABANDONMENT — § 17a-112(c)(3)(A)
As its first ground against Michelle H., the petitioner alleges that she abandoned Ryan within the meaning of § 17a-112(c)(3)(A).[24]
The respondent argues that her contact with Ryan, during the adjudicatory period, outweighs any evidence of abandonment. Applying the requisite legal standards,[25] the court finds this matter in favor of the petitioner.
A review of the clear and convincing evidence related to Michelle H.'s conduct reveals that from July 15, 1999 through July 21, 2000, this respondent largely failed "to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child. . . ." In reDeana E., supra, 61 Conn. App. 193. Following her discharge from MF-WAC in mid-1999, Michelle H., served as Ryan's primary caretaker and did show some interest in his well-being:[26] sadly, this demonstration of maternal attention was short-lived. Michelle H. recommenced using cocaine in October 1999, left the child without adult supervision, and repeatedly attended to her own personal desires instead of caring for Ryan, who was therefore returned to DCF custody.
Furthermore, from November 1999, when she left the home of Marge and Keith C., through the date of her entry into the SCADD Program, Michelle H. exhibited a fundamentally inadequate pattern of interest in the child. She had little formal contact with Ryan from November 1999 through mid-March 2000, attending only three scheduled visitation sessions during this period due to her continued drug use and sporadic contact with DCF. Prior to entering SCADD, Michelle H. never called the foster parents to CT Page 14377 inquire about Ryan's well-being. (Testimony of Marge C.) She contacted DCF during this period on an unpredictable and sporadic basis, rarely inquiring about the child. Prior to the submission of the TPR petition, Michelle H. did not provide gifts, cards or letters to Ryan for Christmas 1999, or for Valentine's Day, Easter, his birthday, or any other commemorative date; and she did not call him.[27] Michelle H. only briefly supplied Ryan with his necessary food, clothing or medical care; generally left others to provide him with an adequate domicile; provided little social or religious guidance; and personally interacted with him on only a minimal basis during this period. In re Deana F., supra,61 Conn. App. 193. (Testimony of Deborah D., Marge C., Emily C.)
Michelle H. asserts that after Ryan's November 1999 return to DCF care, she frequently visited him at Margaret O.'s home and at his foster home, and therefore cannot be found to have abandoned him. However, the evidence clearly and convincingly establishes that prior to the respondent's involvement with the Carnes Weeks and SCADD programs in June 2000, any such visits were sporadic and of extremely brief duration, without any effective communication or contact between Ryan and Michelle H.[28] Given Michelle H.'s admission that she was actively using cocaine from the fall of 1999 through mid-June 2000, the court finds that the quality of any informal visits during this period was poor, one-sided in favor of the respondent, and yielding little or no benefit to the child. (Testimony of Michelle H., Emily C.) See In re Amy H.,56 Conn. App. 55, 60, 742 A.2d 372 (1999).
The adjudicatory phase in this matter effectively covers the first fourteen months of Ryan's life. Appropriately focusing upon Michelle H.'s conduct during this period,[29] it is abundantly clear that she barely assumed any responsibility for Ryan's welfare; used cocaine when she was charged with his well-being; only briefly provided a home for him; failed to provide appropriate supervision, and left the child unattended even when she did provide a home for him; only intermittently attended to Ryan's basic needs; and effectively failed to meet the commonly understood obligations of parenthood as set forth in In re Deana E., supra, 61 Conn. App. 193. Although Michelle H. loves this child, the evidence clearly and convincingly establishes that she failed to visit Ryan more then a handful of times from November 1999 through the date when the TPR petition was submitted; that she did only sporadically displayed maternal affection and largely left him alone during this formative period; and that she demonstrated, at the very most, intermittent indicia of interest in her son by maintaining contact with his caretakers. Accordingly, based on the clear and convincing evidence presented at trial, the court finds that the petitioner has met her burden of proving that Michelle H. abandoned Ryan, within the meaning of §17a-112(c)(3)(A). CT Page 14378
II. B. 2. FAILURE TO REHABILITATE — § 17a-112(c)(3)(B)
The petitioner next alleges that Michelle H.'s parental rights should be terminated because she has failed to achieve rehabilitation, within the meaning of § 17a-112(c)(3)(B).[30] Michelle H. counters that she completed the pivotal elements of the specific steps and has made such progress that she can serve a constructive and useful role as a parent. As Ryan was adjudicated a neglected child on July 15, 1999, and specific steps were imposed for Michelle H. beginning in May 1999, the critical issue for this court is limited to whether the respondent has achieved rehabilitation sufficient to render her able to care for this child. Applying the requisite legal standards,[31] the court finds this issue in favor of the petitioner.
Several aspects of the clear and convincing evidence confirm that Michelle H. has not achieved the degree of rehabilitation with regard to her issues of substance abuse, anger, domestic violence, and parental judgment that would encourage the belief that at some reasonable date in the future she could assume a responsible position in Ryan's life. See Inre Daniel C., supra, 63 Conn. App. 354; In re Ashley S., supra,61 Conn. App. 665; In re Sarah Ann K., supra, 57 Conn. App. 448. First, Dr. Grenier's credible psychological opinions consistently establish that Michelle H. has not achieved § 17a-112(c)(3)(B) rehabilitation.[32]
Dr. Grenier observed that Michelle H. only gained ground in her battle against substance abuse when she participated in a very long-term placement in a structured residential setting, with strict rules, curfews, and regular drug screens in effect to monitor and moderate her behavior. Under these circumstances, Michelle H.'s maintenance of sobriety while attending a supportive residential program such as SCADD does not serve as a reliable indication of the respondent's ability to retain control over her substance abuse and anger issues once she returns to live in the community.[33] Rather, the court credits Dr. Grenier's cogent opinion that given Michelle H.'s extensive history of cocaine abuse and her persistent pattern of failure at substance abuse treatment, this respondent cannot properly be identified as a valid parental caretaker until she has demonstrated at least an entire year of substance free living, in compliance with the law, after she is released from SCADD's direct supervision.[34] (Testimony of Dr. Grenier, Michelle H.) Given the age, sensibilities, needs and satisfactory current placement of the child involved, a year is an unreasonably time long to wait for Michelle H. to be able to manifest rehabilitation from her substance abuse, anger, and parenting issues, so as to be able to serve as a safe, responsible parent for Ryan.[35]
Second, Michelle H.'s long history of repeated, unsuccessful attempts CT Page 14379 at curbing her cocaine use itself does not augur well for Michelle H.'s attempts to maintain long-term sobriety after her discharge from SCADD. As noted in Part I. A., this respondent had been addicted to cocaine since 1993, and failed substance abuse treatment in the past from Berkshire Woods, the Joseph Center, and McCalls. After Ryan's birth in 1999, Michelle H. was similarly unsuccessful with substance abuse treatment and individual counseling services proffered through MF-WAC, MF-OP, FSGW, and the LifeLine Program.[36] Her minimal cooperation with treatment providers, manifest anger, emotional outbursts, negative attitude and unwillingness to participate in counseling or to comply with reasonable program rules caused her failure with each of these inpatient and outpatient rehabilitation programs. Michelle H.'s ingrained behavior pattern is that after termination from a treatment program, she relapses into cocaine use, which then supercedes her interest in or ability to provide care for her children.[37] (Testimony of Ellen C., Michelle H.) This history serves as a valid basis for Dr. Grenier's observation that absent reliable evidence that Michelle H. is able to live drug-free for a prolonged period of time outside of program supervision, there could be no reasonable psychological basis for concluding that she has achieved a sufficient degree of rehabilitation to serve as an appropriate caretaker for Ryan.
Third, the evidence clearly and convincingly indicates that Michelle H. failed to fulfill a number of the specific steps which were effective elements of her rehabilitation process. As described in Part I. A., steps had been assigned so that Michelle H. would participate in substance abuse treatment, and timely begin the process of recovery. During the first year of Ryan's life, however, Michelle H. did not fulfill these steps, but resumed the use of cocaine;[38] caused her own discharge from the MF-WAC and Lifeline programs due to her negative attitude and noncompliance; and disregarded timely referrals to substance abuse treatment at Carnes Weeks, Trinity Glen, and AA/NA meetings. (Exhibits 5, 14; Testimony of Emily C.) Although the steps required Michelle H. to undergo individual counseling, she failed to follow through with appropriate services offered through FSGW, Lifeline and the drug treatment facilities to which she was referred. Even though the steps required Michelle H. to visit the child as often as DCF permitted, her contacts with the child were minimal in quantity and of only modest quality during his second six months of life. Moreover, although the specific steps required her to maintain stable housing, the evidence compels the conclusion that she failed to do so for long periods of time, moving from place to place without providing DCF with accurate phone numbers or addresses at which she could be reached until she entered Carnes Weeks and transferred to the SCADD program after the TPR petition was filed. (Testimony of Deborah D., Emily C., Michelle H.) CT Page 14380
Fourth, the tone, demeanor and the content of Michelle H.'s own trial testimony clearly and convincingly establishes that she is still adversely affected by her unresolved issues of anger and impulsivity.[39]
See State v. Owens, 63 Conn. App. 245, 251, ___ A.2d ___ (2001). At trial, Michelle H. admitted that even after a year of treatment at SCADD, she remains greatly troubled by her impatience, and that she still needs to work on this aspect of her character, which has adversely affected her life.[40] Anger, impulsivity and impatience are precisely the characteristics that have been noted by the service providers who have worked with Michelle H. since Ryan's birth. Furthermore, Michelle H.'s testimony concerning ostensibly offensive, intrusive conduct she imputed to the foster family and DCF reflects her unreasonable degree of hostility and suspicion concerning the beneficial efforts made by others to help her and her child.[41] All of these ingrained personality traits remain incompatible with providing Ryan with a stable, consistent and secure home in which to live and grow.
The evidence supports the determination that after nearly a year of treatment and counseling in the SCADD program, Michelle H. made a modest amount of progress toward her goals. However, balancing the weight of this progress against the restricted environment required for Michelle H. to remain sober, the lengthy time still needed to verify rehabilitation given her history of repeated relapse despite treatment, and her continued anger issues, the court is constrained to conclude that although ". . . the respondent had made some progress in recovering from drug abuse and in improving her parenting skills . . . those efforts were too little and too late." (Quotation marks omitted.) In re Sheila J.,62 Conn. App. 480-481, ___ A.2d ___ (2001).
In its totality, the clear and convincing evidence thus compels the conclusion that despite some recent improvement in her ability to manage her own life, Michelle H. remains without the qualities necessary to successfully parent Ryan.[42] Under these circumstances, the court concludes that Michelle H. was no better able "to resume the responsibilities of parenting at the time of filing the termination petition than [she] had been at the time of [Ryan's] commitment." In re Hector L., 53 Conn. App. 359, 367, 730 A.2d 106 (1999). As the clear and convincing evidence also reflects that the current degree of Michelle H.'s rehabilitation falls short of that which would reasonably encourage a belief that, at some reasonable future date, she could assume a responsible position in Ryan's life, the petitioner has met her burden of proof under § 17a-112(c)(3)(B).
 II. B. 3. LACK OF ONGOING PARENT-CHILD RELATIONSHIP — § 17a-112(c)(3)(D)
CT Page 14381
The petitioner next alleges that no ongoing parent-child relationship exists between Michelle H. and Ryan, and that the child's best interests will not be served by allowing additional time for this relationship to develop, so that the TPR petition should be granted pursuant to General Statutes § 17a-112(c)(3)(D). The respondent argues that her informal visits with Ryan supported their parent-child relationship, even while he remained in foster care, and that Ryan will benefit from further contact. Applying the requisite legal standards,[43] the court finds this matter in favor of the petitioner.
As to the first prong of the § 17a-112(c)(3)(D) analysis,[44]
clear and convincing evidence establishes that Michelle H. and her young son do not share the parent-child bond that develops when a parent meets, "on a day to day basis the physical, emotional, moral and educational needs of the child. . . ." § 17a-112(c)(3)(D); see alsoIn re Jonathon G., supra, 63 Conn. App. 525. During the fourteen months of Ryan's life prior to the submission of the TPR petition, Michelle H. only briefly served as his primary caretaker. As discussed in Part II. B. 1., the respondent maintained little contact with Ryan during the period of November 1999 through July of 2000, despite DCF's proffer of visitation services, instead lapsing into her cocaine-oriented lifestyle. During this significant part of the adjudicatory period, Michelle H. did not financially support the child, maintain a stable residence for him, retain employment, or otherwise meet Ryan's educational, emotional and moral needs. While it is clear that Michelle H. loves her son, he is too young to express his opinions concerning the role she should have in his life. The evidence compels the conclusion that any relationship that Michelle H. developed with Ryan, after the filing of the TPR petition, at best reflects that of playmates, not a parent-child connection.[45]
As to the second prong of the § 17a-112(c)(3)(D) analysis, clear and convincing evidence establishes that to allow further time for the establishment or reestablishment of a parent-child relationship between Michelle H. and Ryan would be detrimental to this child's best interests. As discussed in Part II. B. 2., Michelle H.'s rehabilitation process has advanced, but she has far to go before successful control over substance abuse, anger, and parenting issues can be established. Although she is employed, Michelle H.'s long-term prospects for housing are unknown. On the other hand, as fully discussed in Part III. B., Ryan has comfortably resided under the care of his devoted foster parents, Marge and Keith C., since December 1999. He is growing and developing in a stable environment, bonding with his foster siblings and his extended family, and free from the vagaries of a cocaine-related lifestyle.[46]
Given that Michelle H. still, after a year of rehabilitation assistance, remains unable to provide Ryan with the stability and permanency of CT Page 14382 physical or emotional support that he clearly needs, the court cannot sanction the provision of additional time within which to establish or re-establish a parenting relationship between Michelle H. and her youngest child, as it would be detrimental to his best interests. (Testimony of Dr. Grenier.) See In re Jonathon G., supra,63 Conn. App. 525.
The clear and convincing evidence thus establishes that any valid parenting relationship that Michelle H. may have developed with Ryan has been definitively lost,[47] due to her own absence, inattention, and substance abuse. The clear and convincing evidence in this case further indicates that it is not in Ryan's best interests to allow more time for a relationship to develop with Michelle H., the petitioner has met her burden of proof under § 17a-112(c)(3)(D).
II. C. STATUTORY GROUNDS FOR TERMINATION — JOHN DOE
 II. C. 1. ABANDONMENT — § 17a-112(c)(3)(A)
The petitioner claims that John Doe has statutorily abandoned Ryan, as defined by § 17a-112(c)(3)(A). The uncontroverted evidence establishes that John Doe has never visited, sent cards, letters or gifts, nor has he communicated with Ryan, any family members, or DCF concerning the child's well-being or progress. John Doe has not participated in any court proceedings involving Ryan, has never supported him financially or emotionally, and has no relationship with his son. (Testimony of Deborah D.) The evidence clearly and convincingly discloses that John Doe has failed to maintain a reasonable degree of interest, concern or responsibility as to Ryan's welfare as contemplated by In reDeana E., supra, 61 Conn. App. 193 and In re Shane P., supra,58 Conn. App. 256. Based on the principles set forth in Part II. B. 1., the petitioner has met her burden of proving abandonment pursuant to § 17a-112(c)(3)(A).
 II. C. 2. LACK OF ONGOING PARENT-CHILD RELATIONSHIP — § 17a-112(c)(3)(D)
The petitioner also alleges that John has no ongoing relationship with Ryan, as defined by § 17a-112(c)(3)(A). The clear and convincing evidence establishes that there is absolutely no such connection between John Doe and Ryan, in terms of the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of his child. John Doe has not participated in these court proceedings, has not attempted to establish himself as an individual who is interested in or able to provide for his son's daily needs, nor has he supported Ryan in any way. This child has CT Page 14383 never known John Doe, has no present memories of him, and does not regard him as a paternal figure. (Exhibit 4.). Allowing further time for the development of a parent-child relationship would be confusing at best, and more likely harmful to Ryan's best interests. Thus, applying the principles as set forth in Part II. B. 3. the court finds as to John Doe that the petitioner has met her burden of proving the lack of an ongoing parent-child relationship, within the meaning of § 17a-112(c)(3)(D).
 III. DISPOSITION
As the court has concluded that statutory grounds for termination exist, it next "must determine whether termination is in the best interests of the child. In re Eden F., [supra, 250 Conn. 689]." (Internal quotation marks omitted.) In re Quanitra M., supra, 60 Conn. App. 103. In this dispositional phase the court has considered the evidence and testimony related to circumstances and events through the close of evidence. Practice Book 33-5.
III. A. SEVEN STATUTORY FINDINGS
The court has made each of the seven written factual findings required by General Statutes § 17a-112(d) based upon the clear and convincing evidence presented at trial, and has considered the evidence relevant to each of these findings in deciding whether to terminate parental rights. See In re Jonathon G., 63 Conn. App. 516, 528, ___ A.2d ___ (2001).
 III. A. 1. TIMELINESS, NATURE AND EXTENT OF SERVICES — § 17a-112(d)(1)
DCF extended timely and appropriate services for Michelle H., including: casework services, case management[48] and visitation opportunities; transportation for visitation; referrals for substance abuse evaluation, substance abuse inpatient programs, substance abuse outpatient treatment, parenting classes, individual counseling, and day care. (Exhibit 1; Testimony of Deborah D., Emily C.) Furthermore, on June 7, 2000, the court found services were no longer appropriate for Michelle H. Provision of services was inappropriate and unnecessary for John Doe under the circumstances of this case. See also Parts I. A. and II. A.
 III. A. 2. REASONABLE EFFORTS AT REUNIFICATION PURSUANT TO FEDERAL LAW — § 17a-112(d)(2)
DCF made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended. The court again references the June 2000 finding that such efforts were not appropriate as to Michelle H., and concludes that provision of CT Page 14384 services was inappropriate and unnecessary for John Doe under the circumstances of this case.
III. A. 3. COMPLIANCE WITH COURT ORDERS — § 17a-112(d)(3)
As noted in Part II. B., Michelle H. has only partially complied with court-ordered specific steps. No orders were imposed upon John Doe.
III. A. 4. THE CHILD'S FEELINGS AND EMOTIONAL TIES — §17a-112(d)(4)
Ryan calls his foster parents "mom" and "dad," recognizes his foster mother as his present psychological parent, and is very emotionally attached to his entire foster family. He is also very attached to his half-brothers Michael O. and Brian O., and to their grandmother Margaret O. (Exhibit 2b; Testimony of Dr. Grenier, Marge C., Keith C., Deborah D.)
Ryan responds to Michelle H. in a very positive manner, and she now adeptly engages the child in appropriate activities. However, Ryan and his biological mother retain a relationship that is best characterized as "friendly," rather than one reflecting a parent-child bond. (Exhibit 2a; Testimony of Dr. Grenier.) Ryan has no emotional ties to John Doe.
III. A. 5. AGE OF THE CHILD — § 17a-112(d)(5)
Ryan was born on May 1999, and is now two and a half years old.
III. A. 6. PARENTS' EFFORTS TO ADJUST THEIR CIRCUMSTANCES —§ 17a-112(d)(6)
Prior to the filing of the TPR petitions, Michelle H. did not maintain consistent and reliable contact with DCF regarding Ryan's status, although during this period Michelle H. received some relevant information from the foster parents. A full year after DCF's involvement in the case, Michelle H. began to make realistic and sustained efforts to conform her conduct to acceptable parental standards, although she was, at the time of trial, still engaged in this process. John Doe has never adjusted his circumstances to meet Ryan's needs, and never contacted DCF or the foster parents concerning his child. Giving the respondents additional time would not likely bring their performance, as parents, within acceptable standards sufficient to make it in Ryan's best interests to be reunited with either parent.
 III. A. 7. EXTENT TO WHICH PARENTS WERE PREVENTED FROM MAINTAINING RELATIONSHIPS WITH THE CHILD — § 17a-112(d)(7)
CT Page 14385
No unreasonable conduct by the child protection agency, foster parents or third parties prevented either Michelle H. or John Doe from maintaining relationships with Ryan. While Michelle H. argues that Marge C. and other family members interfered with her parenting abilities, the evidence was insufficient to establish a basis for such a conclusion in fact. Michelle H. admits DCF was supportive throughout the pre-TPR period, and the evidence clearly reflects that the agency advocated on the respondent's behalf for restoration of services at MF-WAC and LifeLine. (Testimony of Emily C.) DCF reasonably requested that Michelle H. undergo evaluation to establish that she had achieved a stable status before reinstituting visits with Ryan following her entry into the SCADD program, which was nearly contemporaneous with the court's recent finding that no further reunification efforts were appropriate. Any interference with the process of maintaining a relationship that may have occurred was not caused by the unreasonable conduct of the petitioner or third parties, but was due to Michelle H.'s resumption of a substance abuse lifestyle. (Testimony of Michelle H.). See In re Amelia W.,62 Conn. App. 500, 506, ___ A.2d ___ (2001).
III. B. BEST INTERESTS OF THE CHILD — § 17a-112(c)(2)
The court is next called upon to determine whether termination of the parental fights of Michelle H. and John Doe would be in Ryan's best interests.[49] Applying the appropriate legal standards[50] to the facts which are clearly and convincingly apparent in this case, the court finds this issue in favor of the petitioner.
In determining whether termination of the respondents' parental rights would be in the best interests of this child, the court has examined the multiple relevant factors, including the child's interests in sustained growth, development, well-being, stability and continuity of his environment; his length of stay in foster care; the nature of his relationship with his foster parents and biological parents; and the degree of contact maintained with his biological parents. In re AlexanderC., 60 Conn. App. 555, 559, ___ A.2d ___ (2000); In re Shyina B.,58 Conn. App. 159, 167, ___ A.2d ___ (2000); In re Savanna M., supra,55 Conn. App. 816. "[T]he genetic bond shared by a biological parent and his or her child, although not determinative of the issue of the best interest of the child, is certainly a factor to consider." (Citations and quotation marks omitted.) Id. In a matter such as this, the court is further called upon to balance the child Ryan's intrinsic needs for stability and permanency against the maintenance of any connection with his biological parents. See Pamela B. v. Ment, 244 Conn. 296, 314,709 A.2d 1089 (1998) (child's physical and emotional well-being must be weighed against the interest in preserving family integrity). CT Page 14386
When considering Ryan's best interests in this case, the court has considered Michelle H.'s history of homelessness and the unknowns she now faces insofar as residency is concerned, and has contrasted her lifestyle with the consistency, predictability, and stability of the home maintained by Marge and Keith C. The evidence clearly and convincingly reflects that for more than eighteen months, during a crucial period in the physical and emotional development of this very young child, Ryan H. was cared for by his foster parents, Marge and Keith C. Additionally, as a newborn, he had resided in their home under Michelle H.'s care, until the manifest recurrence of her drug use. Marge and Keith C. have expressed not only their desire to adopt Ryan, but also their willingness to maintain a pattern of visitation between the child and Michelle H., at the home of Margaret O. where she sees her other sons. Ryan is extremely bonded to his foster mother and other members of their family, and it is clear that his physical, emotional and parenting needs are all well met in his current placement. On the other hand, despite the progress that has been noted in her substance abuse, anger management, and housing issues, Michelle H. is still not in a position from which she can extend reliable structure and support for this child. Ryan simply cannot be expected to wait any longer for his biological mother to be able to secure and maintain a stable and appropriate living environment; he should be permitted to reside permanently in the home he knows so well, and which has so long served his best interests.
Analyzing the evidence in its entirety, it is clear that any potential benefits of maintaining a legal bond between Michelle H. and Ryan are outweighed by the child's intrinsic and immediate needs for stability and permanency. See Pamela B. v. Ment, supra, 244 Conn. 314. In reaching this conclusion, the court has considered the evidence which suggests that the relationship between Michelle H. and the foster parents is strained and problematic. The court has necessarily acknowledged that termination of Michelle H.'s parental rights could result in the nearly complete, or even permanent, severance of the friendly relationship that she recently has established with her youngest son. See In re Steven N.,57 Conn. App. 629, 632, ___ A.2d ___ (2000). However, in this case, the evidence supports the clear inference that if Michelle H.'s legal parental rights are terminated, the extended family is committed to maintaining a close relationship between the child and his mother, and between the child and his birth siblings, all for Ryan's benefit[51]
(Testimony of Marge C., Keith C., Margaret O.) Thus, while acknowledging the permanence of termination, the court finds that in Ryan's case, although Michelle H. and the foster parents may have to experience considerable healing before they can spend time together, the severance of Michelle H.'s parental rights does not necessarily imply the total loss of this respondent's contact with her youngest son.[52]
CT Page 14387
Our courts have recognized that "long-term stability is critical to a child's future health and development." In re Eden F., supra,250 Conn. 709. Furthermore, "[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence . . ." when resolving issues related to the permanent or temporary care of neglected children. In re Alexander V.,25 Conn. App. 741, 748, 596 A.2d 930 (1992); see also In re JuvenileAppeal (84-CD), 189 Conn. 276, 292, 455 A.2d 1313 (1983). The court is persuaded by the consistent, forthright opinions of the independent psychological expert, Dr. Grenier, and concludes that the clear and convincing evidence in this case establishes that Ryan is entitled to the benefit of ending, without further delay, the long period of uncertainty as to the availability of his biological parents as caretakers. Furthermore, Ryan's attorney has persuasively argued for termination on his behalf. He has highlighted the child's close relationship with his foster siblings, and the unrebutted evidence that his needs are being met in a safe and predictable environment. He urges the court to embrace the structure that has been provided for Ryan in his foster home setting, and to conclude that it would be an unreasonable risk to return him to his biological mother, at this preliminary stage of her rehabilitation. He emphasizes that Ryan needs to have the parental rights of both his mother, Michelle H., and his father, John Doe, terminated at this time.[53]
In this matter, it is clear that given Ryan's long and happy stay in foster care; his loving and healthy relationship with the foster parents, and his sometimes on, sometimes off relationship with Michelle H., it is clear that his best interests will be served by termination of her parental rights, along with termination of the rights in John Doe, followed by adoption.[54] See In re Savanna M., supra, 55 Conn. App. 816. Under all the circumstances, it is clear that Ryan's best interests will be served by timely termination of the parental rights attached to both his biological parents, so the child can be freed for adoption. Accordingly, with respect to the best interests of the child contemplated by § 17a-112(c)(2), by clear and convincing evidence, and based upon all of the foregoing, including the testimony and evidence presented, the court finds that termination of the parental rights of Michelle H. and John Doe is in Ryan's best interests.
 IV. ORDER OF TERMINATION
WHEREFORE, after due consideration of Ryan H.'s sense of time, his need for a secure and permanent environment, the relationship he has established with his foster parents, and the totality of circumstances; and having considered all the statutory criteria and having found by CT Page 14388 clear and convincing evidence that grounds exist for termination of parental rights; and having concluded that the termination of the parental rights at issue will be in Ryan H.'s best interest, the court issues the following ORDERS:
That the parental rights of Michelle H. and John Doe are hereby terminated as to the child Ryan H.
That the Commissioner of the Department of Children and Families is hereby appointed the statutory parent for Ryan H. to secure an adoptive family or other permanent placement for him. That primary consideration for adoption of Ryan H. shall be offered to his current foster parents, who have indicated their willingness to continue family supervision of visitation between Michelle H. and her son.
That a permanency plan shall be submitted within 30 days of this judgment, and that such further reports shall be timely filed with the court, as required by law.
BY THE COURT,
N. Rubinow, J.